OSCAR E. BAAN AND EVELYN K. BAAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

IRVING GORDON AND MARGARET GORDON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 949–63, 3949–63.   Filed October 19, 1965.

72

*Harry R. Horrow* and *Stephen J. Martin*, for the petitioners.
*John W. Holt*, for the respondent.

84

OPINION

RAUM, *Judge:* American Telephone & Telegraph Co. (American), a New York corporation, owned all of the stock or at least a controlling interest in the stock of some 21 corporations engaged in the business of furnishing telephone and other communications services within the United States. In the aggregate, American and its various subsidiaries comprise what is sometimes referred to as the Bell System. Its stock ownership in its west coast subsidiary, Pacific Telephone & Telegraph Co. (Pacific), represented some 89 percent of the latter's voting control. The minority shares in Pacific were publicly held by over 38,000 stockholders, including petitioners.

Pacific operated within the States of California, Oregon, Washington, and a part of Idaho. Between the end of World War II and the beginning of 1961, Pacific's telephone business experienced enormous growth and was expected to continue to expand at a rapid rate. Due to this growth and the size of the area served by Pacific, many of its activities were controlled locally within the various States in which it operated. Eventually a separate division was set up to operate almost autonomously in the States of Oregon, Washington, and Idaho. It was then concluded that it would be preferable to disassociate completely the activities of that division from the operations of Pacific in California by a transfer of the entire business conducted in the three northern States to a new corporation to be followed by a distribution to the shareholders of Pacific of the stock of the new corporation. To accomplish this objective Pacific Northwest Bell Telephone Co. (Northwest) was organized as a Washington corporation on March 27, 1961, and as of July 1, 1961, Pacific transferred to it all of the assets pertaining to operations in the area to be served by the new corporation. In return for the assets received, Northwest assumed some of the liabilities to which such assets were subject, issued to Pacific a promissory note payable on demand in the principal amount of $200 million, and issued to Pacific 30,450,000 shares of its $11 par value common stock having an aggregate par value of $334,950,000.[2]

Since Pacific was then in need of additional capital to finance its own operations in California, the plan to distribute the Northwest shares to Pacific's stockholders was devised in such manner that it

---

[2] Pacific had previously purchased for $110,000 in cash 10,000 shares of Northwest common stock at par, which the Government agrees was an integral part of the later transfer.

would provide Pacific with such needed capital at the same time. This was accomplished by Pacific's issuing transferable short-term rights to its shareholders to buy the Northwest stock.[3] In order to receive a share of Northwest it was necessary to surrender six rights and to pay $16 in cash. Such Northwest stock was expected to have and did in fact have a fair market value substantially in excess of the $16 subscription price. The petitioners in both cases before us exercised their rights, thus obtaining shares of Northwest having a fair market value considerably greater than the cash paid therefor; also, petitioners Gordon had four remaining rights which they sold for $6.36. Two principal problems are thus presented for solution: (1) Whether petitioners in both cases realized dividend income to the extent that the Northwest stock had a fair market value in excess of the subscription price; and (2) what is the proper tax treatment of the cash received by the Gordons upon the sale of their remaining rights?

1. *Exercise of Rights.*—There is no serious question that, apart from certain specific provisions of the 1954 Code, the exercise of rights by Pacific's stockholders in the circumstances of this case would result in their receiving taxable dividends equal to the excess of the value of the Northwest stock over the subscription price. So much is clear from such decisions as *Palmer* v. *Commissioner*, 302 U.S. 63, and *Choate* v. *Commissioner*, 129 F. 2d 684 (C.A. 2).[4] However, petitioners contend that there are provisions in the 1954 Code which preclude the treatment of the foregoing amounts as taxable dividends. They argue that the transaction was completely tax free under section 355, dealing with the distribution of stock and securities of a controlled corporation (so-called spin-off or divisive reorganization), or alternatively under section 354, involving exchanges of stock and securities in certain reorganizations. As a further alternative, they take the

---

[3] Pacific thus disposed of some 57.3 percent of its Northwest stock in 1961 and the remainder in 1963. There is no dispute between the parties that the two offerings were component parts of a single plan and that they must be regarded together as resulting in the disposition of 100 percent of the Northwest stock in a single transaction.

The amount of stock (57.3 percent) covered by the first offering was determined in such manner that direct control of the new corporation (over 50-percent stock ownership) would pass immediately from Pacific to American.

[4] The *Palmer* case has generally been regarded as based upon the theory that there may be a taxable dividend where the optioned stock is worth more than the subscription price at the time of the offering, and since the Northwest stock had a value substantially in excess of the subscription price at the time of issuance of the rights, there is not present here the condition for nontaxability that existed in the *Palmer* case itself. The scope of *Palmer* was considered at length in *Choate,* and, since the value of the Northwest stock on the dates of exercise of the rights herein was not in excess of its value on the date of issuance of the rights the problem which proved so troublesome in *Choate* is not before us. The Commissioner has charged petitioners with having received dividends only to the extent that the Northwest stock had a value on the date of exercise of the rights in excess of the subscription price, and such excess in turn was less than the corresponding excess as of the time of the offering.

position that if sections 355 and 354 are inapplicable, then the distribution resulting from the receipt of Northwest stock by petitioners was a distribution in partial liquidation of Pacific under section 346(b), resulting in the realization of capital gains as provided therein. Since we have reached the conclusion that section 355 is applicable, we do not pass upon the alternative contentions.

Section 355 is captioned "DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION." Subject to various conditions and limitations spelled out therein,[5] it was intended to provide for nonrecognition of gain or loss in a so-called spin-off or divisive reorganization, whereby a corporation divests itself of one of its business enterprises through the medium of distributing to its stockholders the stock of a subsidiary in which such business is being carried on at the time of distribution. See S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 266–268. It is undisputed that the telephone and communications operations

---

[5] SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.
  (a) EFFECT ON DISTRIBUTEES.—
    (1) GENERAL RULE.—If—
      (A) a corporation (referred to in this section as the "distributing corporation")—
        (i) distributes to a shareholder, with respect to its stock, or
        (ii) distributes to a security holder, in exchange for its securities,
solely stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,
      (B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),
      (C) the requirements of subsection (b) (relating to active businesses) are satisfied, and
      (D) as part of the distribution, the distributing corporation distributes—
        (i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or
        (ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary or his delegate that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax,
then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.
     \*       \*       \*       \*       \*       \*       \*
    (3) LIMITATION.—Paragraph (1) shall not apply if—
      (A) the principal amount of the securities in the controlled corporation which are received exceeds the principal amount of the securities which are surrendered in connection with such distribution, or
      (B) securities in the controlled corporation are received and no securities are surrendered in connection with such distribution.
For purposes of this section (other than paragraph (1)(D) of this subsection) and so much of section 356 as relates to this section, stock of a controlled corporation acquired by the distributing corporation by reason of any transaction which occurs within 5 years of the distribution of such stock and in which gain or loss was recog-

conducted in Oregon, Washington, and Idaho constituted a separate business; and it is also undisputed that if Pacific had transferred that business to Northwest solely for stock of the latter (here Pacific received a $200 million note in addition to stock), and if Pacific had then distributed the Northwest stock without consideration to its own stockholders (rather than through the medium of stock rights), the distribution would have qualified as a nonrecognizable spin-off. Such distribution would have been what petitioners properly characterize as a classic case of a tax-free divisive reorganization. And we hold that neither the use of stock rights nor the presence of the note requires a different result under section 355.

Subject to the conditions spelled out in the four subparagraphs (A) through (D), section 355(a)(1) provides in substance that where a corporation (the "distributing corporation") distributes to its shareholders stock of a corporation controlled by it no gain or loss shall be recognized by the distributees. Cf. *W. E. Gabriel Fabrication Co.*, 42 T.C. 545, 551. The principal controversy herein relates to subparagraphs (A) and (C). Subparagraph (B) is not involved at all since there is no contention that the transaction was used as a "device for the distribution of the earnings and profits" of either Pacific or Northwest. And subparagraph (D) is involved herein only in a manner closely related to subparagraph (A).

nized in whole or in part, shall not be treated as stock of such controlled corporation, but as other property.

\* \* \* \* \* \* \*

(b) REQUIREMENTS AS TO ACTIVE BUSINESS.—

(1) IN GENERAL.—Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, or

(B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporations and each of the controlled corporations is engaged immediately after the distribution in the active conduct of a trade or business.

(2) DEFINITION.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

(D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business—

(i) was not acquired directly (or through one or more corporations) by another corporation within the period described in subparagraph (B), or

(ii) was so acquired by another corporation within such period, but such control was so acquired only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period.

The conditions of subparagraph (A) appear in section 355(a)(1) as follows:

SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.

(a) EFFECT ON DISTRIBUTEES.—

(1) GENERAL RULE.—If—

(A) a corporation (referred to in this section as the "distributing corporation")—

(i) distributes to a shareholder, with respect to its stock * * *

\* \* \* \* \* \* \*

solely stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,

\* \* \* \* \* \* \*

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

As we understand the Government's position, it is that the conditions of (A) have not been satisfied since Pacific did not distribute the stock of Northwest but rather distributed rights to purchase the Northwest shares,[6] and that the stock of Northwest was in any event not distributed "with respect to its [Pacific's] stock." We think that these contentions are unsound.

The Government's position is based upon a highly technical and inhospitable reading of the statute that fails to give effect to the basic objective that Congress sought to achieve. This case concededly involves a spin-off. Pacific plainly divested itself of the business which it had conducted in the three northwest States. Had it distributed the Northwest stock directly to its stockholders without consideration there would clearly have been the type of divisive reorganization contemplated by the statute, at least as far as subparagraph (A) is concerned. And, in our view, the situation is not changed merely because that distribution was conditioned upon payment of $16 a share by the distributees. It was nonetheless a distribution of Northwest stock to these petitioners, stockholders in Pacific, made "with respect to" their ownership of stock in Pacific. If Congress had intended that a distribution of the Northwest stock be treated as tax free when made without consideration, it is inconceivable that it could have intended the transaction to result in taxable income to the distributees where they *paid out* money in connection with receiving such stock. The stock of Northwest was literally "distributed" to petitioners, albeit for a consideration, and we hold that the statute should not be con-

---

[6] It argues further at this point that such rights did not constitute "stock or securities" within sec. 355(a)(1)(A). In view of our conclusion that the shares of Northwest rather than the rights were the subject of the distribution within the meaning of (a)(1)(A) it becomes unnecessary to resolve the controversy as to whether the rights themselves would qualify as "stock or securities."

strued so as to depart from such literal meaning, where to do so would frustrate the legislative purpose.

The Government's argument revolves largely around the notion that the rights to subscribe were the subject of the distribution rather than the Northwest stock itself, and that the stock was obtained only as a result of exercising those rights. However, *Palmer* v. *Commissioner*, 302 U.S. 63,[7] makes it clear that issuance of the rights, even though they may be valuable, may not be considered as a distribution of corporate earnings and profits. If any income is to be charged to petitioners it must be regarded as stemming from the exercise of the rights, by obtaining the Northwest stock for a consideration less than its fair market value. But section 355 was intended to permit the receipt of such stock without tax even where the recipient paid nothing therefor, and we think it would be a distortion of congressional purpose to impute an intention to impose the tax where the recipient was required in effect to contribute to the capital of the distributing corporation as a condition to receiving the distributed stock. We conclude that the transaction before us was within the terms of section 355(a)(1)(A), and we next consider whether the conditions of (a)(1)(C) have been met.

Subparagraph (C) is not self-contained, but incorporates other provisions by reference; it spells out as one of the conditions for non-recognition in section 355(a)(1) that "(C) the requirements of subsection (b) (relating to active businesses) are satisfied." Thus, subparagraph (C) is really nothing more than the means whereby the provisions of subsection (b) are brought into play at this point.

Subsection (b) provides in part as follows:

(b) REQUIREMENTS AS TO ACTIVE BUSINESS.—

(1) IN GENERAL.—Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation * * * is engaged immediately after the distribution in the active conduct of a trade or business, or

\* \* \* \* \* \* \*

(2) DEFINITION.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

---

[7] There is no merit to the Government's contention that *Palmer* is no longer good law in this respect. There is no indication in the 1954 Code that Congress intended to disapprove any part of that decision, and it has been applied by the courts in cases arising thereunder. See *William H. Bateman*, 40 T.C. 408. The employee stock option cases, *Commissioner* v. *LoBue*, 351 U.S. 243, and *Commissioner* v. *Smith*, 324 U.S. 177, relied on by the Commissioner as authority overruling *Palmer*, do not discuss this aspect of that case at all, but rather cite *Palmer* with approval in other respects.

(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

There is no dispute that Pacific and Northwest were each engaged in the active conduct of a trade or business within (b) (1) (A), or that the requirements of (b) (2) (A) and (b) (2) (B) have been met. However, the Government argues that there has been a failure in respect of Northwest to comply with (b) (2) (C), in that the transaction whereby Northwest acquired its business from Pacific was one "in which gain or loss was recognized in whole or in part." Petitioners vigorously deny that any gain or loss was recognized.

The purpose of these provisions was to prevent a tax-free distribution of a corporation's earnings and profits through the medium of a temporary purchase of a going business with liquid assets and then in effect distributing those assets to its stockholders. See Cohen, Silverman, Surrey, Tarleau, and Warren, "The Internal Revenue Code of 1954: Corporate Distributions, Organizations, and Reorganizations," 68 Harv. L. Rev. 393, 430. Plainly, no such circumstances were present here, since this case involves a bona fide separation of a business conducted for many years by Pacific. We turn then to the particular contentions urged by petitioners in support of their position that the gain on the transfer of assets by Pacific to Northwest was non-recognizable. They rely upon two alternative grounds: (1) That as a result of the consolidated return filed in behalf of Pacific and the affiliated group, no gain or loss was in fact recognized; and (2) that in any event the transfer of the business by Pacific to Northwest was nonrecognizable under section 351.[8]

It is in connection with this second ground that the matter of the $200 million note becomes pertinent, since the Government contends that Pacific's transfer to Northwest was not "solely in exchange for stock or securities" of Northwest, in view of the note as part of the consideration for the transfer. Petitioners, on the other hand, argue that the note is a security within the meaning of section 351. We need not resolve this controversy, because, in our view, there was no recognizable gain or loss by reason of the consolidated return, and it therefore becomes unnecessary to consider the alternative ground.

As subsidiaries of American, Pacific and Northwest were included in the group of affiliated corporations for which a consolidated return was filed for 1961. Thus, the gain resulting from the transfer of assets from Pacific to Northwest which might otherwise have been subject to

---

[8] SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. * * *

tax was eliminated in that consolidated return pursuant to regulations prescribed by the Commissioner under section 1502. Those regulations provide as follows (Income Tax Regs., sec. 1.1502–31(b)(1)):

(b) *Computations.* In the case of affiliated corporations which make, or are required to make, a consolidated return, and except as otherwise provided in the regulations under section 1502:

(1) *Taxable income.* The taxable income of each corporation shall be computed in accordance with the provisions covering the determination of taxable income of separate corporations, except:

(i) There shall be eliminated unrealized profits and losses in transactions between members of the affiliated group and dividend distributions from one member of the group to another member of the group (referred to in the regulations under section 1502 as intercompany transactions);

The Government does not dispute that the gain upon the transfer from Pacific to Northwest was properly relieved of tax in the consolidated return. It argues, however, that the regulations provide for the *elimination* of gain or loss whereas sections 355(b)(2)(C) and 351 are phrased in terms of *nonrecognition* of gain or loss. It contends that the gain herein was "recognized" but "eliminated." We think that this distinction is spurious, and that the terms "elimination" and "nonrecognition" are intended to be synonymous in this context. Apart from the absence of any solid basis for the claimed distinction, a careful textual examination of the statute and regulations discloses that the word "eliminated" was used in the sense of "nonrecognition."

Under the regulations "unrealized profits and losses" arising out of intercompany transactions are to be "eliminated." Here, it is undisputed that the gain on the transfer from Pacific to Northwest was properly "eliminated," and therefore must have been an "unrealized" gain within the meaning of these provisions. Yet section 1002 directs that, except as otherwise provided, the entire gain or loss on a sale or exchange of property determined under section 1001 shall be "recognized." And section 1001(a) states that the gain on sale of property "shall be the excess of the amount realized therefrom over the adjusted basis." Thus, if no gain were "realized" within the meaning of the regulations so as to justify "elimination," no such gain was "recognized."

This result is confirmed by examining the consequences that would follow in respect of the basis of the transferred property. Section 1051, dealing with the basis of property acquired in an intercompany transaction, provides as follows:

SEC. 1051. PROPERTY ACQUIRED DURING AFFILIATION.

In the case of property acquired by a corporation, during a period of affiliation, from a corporation with which it was affiliated, the basis of such property, after such period of affiliation, shall be determined, in accordance with regula-

tions prescribed by the Secretary or his delegate, without regard to inter-company transactions in respect of which gain or loss was not recognized. \* \* \*

The basis of the property is thus to be determined "without regard to inter-company transactions in respect of which gain or loss was not recognized." However, if gain were "recognized" in such a transaction, the basis of the property in the hands of the transferee would be "increased in the amount of gain recognized to the transferor." Sec. 362.

Plainly, all of the foregoing provisions contemplate *nonrecognition* of gain or loss in intercompany transactions, with the result that the transferred property retains its basis in the hands of the transferee. If "elimination" meant something different from "nonrecognition," and if the Commissioner were correct here, then we would have the bizarre situation where the gain were "recognized" even though "eliminated" and the property transferred would acquire a stepped-up basis even though no tax were paid on the gain. We can hardly imagine the Commissioner accepting any such result without a struggle. The real difficulty is due to his unsound position here. We hold that the gain "eliminated" in the consolidated return was not "recognized," with the consequence that the requirements of section 355(b)(2)(C) have been met, thus complying with the condition of section 355(a)(1)(C).

There remains finally for consideration whether the condition of section 355(a)(1)(D) has been met. As already noted, subparagraph (D) is closely related to (A) as it is involved herein. It requires that—

> (D) as part of the distribution, the distributing corporation distributes—
>> (i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or
>> (ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c) \* \* \*

Certainly, Pacific disposed of every share of Northwest, retaining none whatever, thus satisfying the underlying objective of subparagraph (D).[9] The reasoning behind the Government's highly technical argument that Pacific did not "distribute" all the Northwest stock is basically the same as its position under (A), and rests on the notion that the issuance of the stock rights and the exercise there-

---

[9] That objective has been satisfied by Pacific's parting with every share of Northwest. However, if it be thought necessary that such distribution be made to the stockholders of Pacific, the fact that some shares were transferred to purchasers of rights rather than to the stockholders is immaterial here. For, not only did the ultimate transferees take through the stockholders, but in any event the record discloses that the stock rights sold represented only a small percentage of the rights issued, and at least more than 80 percent of the shares, constituting control under sec. 368(c), were in fact distributed to shareholders of Pacific, thus satisfying either part (i) or (ii) of subpar. (D).

of preclude a finding that Pacific had "distributed" all of the Northwest stock. We reject that position here in accordance with the conclusion that we reached in respect of the argument relating to (A).

2. *Sale of Rights.*—The remaining issue concerns the taxation of the proceeds received by petitioners Gordon from the sale of four of the rights issued to them. This sale took place on October 5, 1961, and the Gordons received $6.36 for the four rights or $1.59 each. In *Gibson* v. *Commissioner*, 133 F. 2d 308 (C.A. 2), the court held that a sale of rights results in "ordinary income" at least "to the extent of the spread between the market value of the stock at the time of the issuance of the option and the option price for the stock" (p. 309).

The value of the rights herein on the issuance date, September 29, 1961, was greater than $1.59 per right so that there is not presented here any problem comparable to that considered in *Choate* v. *Commissioner*, 129 F. 2d 684 (C.A. 2), where the market value of the optioned stock increased after the rights were issued.

In *Gibson*, the court determined that the petitioner there received an option to obtain a distribution, and through a sale of her rights she anticipated that distribution. The amount realized in anticipation of the distribution was required to be treated in the same manner as the distribution itself. Cf. *Helvering* v. *Horst*, 311 U.S. 112.

Petitioners accept this reasoning, but contend that since under section 355 the distribution of stock in the present case is nontaxable and no gain would be recognized until a sale of the stock, the amounts realized from a sale of the rights should be taxed in the same manner as gains from sales of the stock, i.e., capital gains. This argument fails to take into account the nature of section 355, which is a nonrecognition provision, and can be utilized only by those shareholders who come within its terms. Those shareholders who sold their rights did not come under section 355 in respect of such rights,[10] and without section 355 a distribution of the stock of another corporation would have resulted in the distribution of a dividend to the shareholders of the distributing corporation. The anticipation of such a distribution results in a realization of income which must similarly be treated as a dividend to which the dividends received credit applies. Cf. *Tobacco Products Export Corporation*, 21 T.C. 625.

> *Decision will be entered for the petitioners in docket No. 949–63.*
>
> *Decision will be entered under Rule 50 in docket No. 3949–63.*

---

[10] The same would be true with respect to any other provisions, such as those in sec. 354, upon which petitioners might rely as a ground for relieving them of the tax upon the exercise of the rights, even if we were to hold such provisions applicable in such circumstances, an issue that we found unnecessary to decide. See pp. 87–88, *supra.*