GERALD R. REDDING AND DOROTHY M. REDDING, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

THOMAS W. MOSES AND ANNE M. MOSES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5174–75, 5176–75.    Filed January 22, 1979.

*Robert N. Davies*, for the petitioners.
*Thomas L. Kummer*, for the respondent.

## OPINION

BRUCE, *Judge:* Respondent determined deficiencies in the Federal income taxes of petitioners for the calendar year 1971 as follows:

| Docket No. | Petitioners | Deficiency |
|---|---|---|
| 5174–75 | Gerald R. Redding and Dorothy M. Redding ........... | [1]$3,397.91 |
| 5176–75 | Thomas W. Moses and Anne M. Moses .................. | 10,665.39 |

These consolidated cases raise two significant and complex issues concerning the taxability of corporate distributions. The threshold question is whether petitioners received taxable dividend income as a result of either their receipt or exercise of rights issued to them by the Indianapolis Water Co. (Water Co.) to acquire stock in its wholly owned subsidiary, the Shorewood Corp. (Shorewood), for less than its fair market value. Resolution of this question depends upon (1) whether, if the rights distribution and stock distribution to petitioners are viewed as an integrated whole for tax purposes, the overall transaction satisfies the requirements of section 355,[2] and if so, (2) whether the rights distribution to petitioners is to be accorded independent tax significance or is but a step in an integrated transaction, which step is to be ignored for tax purposes. In the event the transaction is not governed by section 355, we must determine the proper measure of the tax, i.e., whether it is the rights distribution or the exercise of the rights which triggers the dividend provisions of the 1954 Code. The amount of gain realized by petitioner Thomas W. Moses upon his sale of 8,000 shares of Shorewood stock is also at issue herein, but resolution of that dispute has been treated by the parties as entirely dependent upon our determination of the principal questions.

The facts have been fully stipulated by the parties, and, with one exception (see n. 3 *infra*), we adopt them as our findings.

Petitioners Gerald W. and Dorothy M. Redding and petitioners Thomas W. and Anne M. Moses are respectively husbands and wives with their legal residences in Indianapolis, Ind. Each timely filed joint Federal income tax returns for the calendar year 1971 with the Office of the Internal Revenue Service at Memphis, Tenn.

[1] Respondent concedes on brief that the sole adjustment in his notice of deficiency which increased the taxable income of petitioners Redding overstated the proper amount of such increase. Consequently, if the issue providing the basis for respondent's adjustment is decided in accordance with his position on brief, a computation under Rule 155 will nevertheless be necessary in docket No. 5174–75.

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.

Water Co., an Indiana corporation organized in 1881, is a public utility engaged in the distribution and sale of water throughout Indianapolis, Ind. Shorewood is an Indiana corporation organized on November 7, 1960, primarily for the purposes of acquiring, operating, developing, and selling certain real estate, initially, at least, certain property originally acquired by Water Co. incident to its acquisition of land for water supply reservoirs. Since 1964 and through the present time, each corporation has engaged in the active conduct of its own trade or business.

From the date of its incorporation until December 24, 1970, Shorewood had 1,000 shares of common stock outstanding, all of which were owned by Water Co. On December 24, 1970, Shorewood's authorized common stock was increased from 1,000 shares with a par value of $100 per share to 2,500,000 shares with a par value of $1 per share. The same day, Shorewood issued 481,291 shares of the $1 par value common stock to Water Co. in exchange for the 1,000 shares of $100 par value common stock then outstanding. On January 6, 1971, Shorewood and Water Co. entered into a stock purchase agreement for the acquisition by Water Co. of 855,630 additional shares of Shorewood common stock. At no time prior to or during 1971 did Shorewood have shares of stock outstanding other than shares of its common stock.

On January 7, 1971, Water Co. distributed, with respect to its stock, to its shareholders of record at the close of business on January 6, 1971, rights, evidenced by transferable warrants, to acquire an aggregate of 1,069,537 shares of Shorewood common stock. The aggregate shares offered were comprised of the 855,630 shares to be acquired by Water Co. pursuant to the January 6 agreement with Shorewood and 213,907 shares of the 481,291 Shorewood shares already held by Water Co. Each Water Co. shareholder received one right for each share of common stock held by him.

Each right distributed by Water Co. consisted of (1) a primary subscription right to subscribe for 1 share of Shorewood common stock upon the surrender to two rights plus the subscription price of $5, and (2) an additional subscription privilege to subscribe at the same subscription price of $5 per share to all shares not subscribed for pursuant to exercise of the primary subscription rights, subject to allotment and to the right of the

underwriters, under certain conditions, to purchase up to 50,000 shares (at the subscription price less minimum commissions). The subscription offer expired at 3:30 p.m. on January 22, 1971, and thereafter the rights and warrants were totally worthless.

During the subscription period, Water Co. shareholders or their transferees or assignees subscribed to all 1,069,537 Shorewood shares offered, except for 50,000 shares acquired by the underwriters. The 1,069,537 Shorewood shares distributed by Water Co. on February 2, 1971, constituted more than 80 percent of the total number of shares of the only class of Shorewood stock outstanding and represented control of Shorewood as defined in section 368(c). Immediately after the distribution, Water Co. continued to own 267,384 Shorewood shares, and Water Co. shareholders held substantially more than 50 percent of the Shorewood stock outstanding. Water Co. shareholders have continued to maintain continuity of interest in Shorewood, and Water Co.'s retention of Shorewood shares was not pursuant to a plan having as one of its purposes the avoidance of Federal income tax.

The reason for Water Co.'s distribution of Shorewood stock was adverse criticism from the Indiana Public Service Commission. Water Co.'s retained control of Shorewood's real estate business was thought to be incompatible with Water Co.'s public utility business. The use of the rights that required payment of a subscription price as the method of distributing Shorewood stock was dictated by Shorewood's need for capital to develop its assets and business. The distribution was not used as a device for distributing Water Co.'s earnings and profits, of which it had accumulated as of January 7, 1971, in excess of $8 million.

The distribution by Water Co. to its shareholders or their assignees consisted exclusively of the rights to acquire Shorewood stock and the 1,069,537 shares which were subsequently distributed upon the exercise of those rights.

The rights were traded over the counter during the subscription period, and the following are representative transactions:

| Date | Number rights sold | Selling price per right | Total |
|------|------|------|------|
| 1/11/71 | 2,960 | $0.625 | $1,850.00 |
| | 900 | 0.6306 | 567.50 |
| 1/12/71 | 1,290 | 0.44 | 567.60 |
| | 2,926 | 0.4928 | 1,441.93 |

| | | | |
|---|---|---|---|
| 1/13/71 | 15,180 | 0.45 | 6,831.00 |
| 1/14/71 | 1,200 | 0.5253 | 630.36 |
| 1/15/71 | 13,924 | 0.4815 | 6,704.42 |
| 1/18/71 | 15,268 | 0.44 | 6,717.92 |
| 1/19/71 | 10,988 | 0.3903 | 4,288.61 |
| 1/20/71 | 4,766 | 0.5271 | 2,512.16 |
| 1/21/71 | 4,682 | 0.955 | 4,471.42 |
| 1/22/71 | 850 | 0.5271 | 448.04 |
| | 8,142 | 1.0647 | 8,668.78 |

The fair market value of Shorewood stock on selected-dates during the subscription period was as follows:

| Date | Fair market value |
|---|---|
| Jan. 7, 1971 | $6.20 |
| Jan. 11, 1971 | 6.20 |
| Jan. 12, 1971 | 6.00 |
| Jan. 13, 1971 | 6.00 |
| Jan. 18, 1971 | 5.70 |
| Jan. 20, 1971 | 6.60 |
| Jan. 21, 1971 | 7.00 |

Petitioners Redding and petitioners Moses were Water Co. shareholders of record on January 6, 1971, and in accordance with their stock holdings, on January 7, 1971, the Reddings received 7,000 rights and the Moseses received 35,543 rights.[3] The Reddings exercised their 7,000 rights on January 12, 1971, and, after tendering those rights and $17,500, they received 3,500 shares of Shorewood common stock on February 2, 1971, the date of the stock distribution. On January 21, 1971, the Moseses exercised their 35,543 rights. The same day, in addition to exercise of the primary subscription rights, petitioner Thomas W. Moses exercised his additional subscription privilege to acquire another 6,228 Shorewood shares. However, 4,000 of these latter shares were acquired in an agency capacity for A. E. Rosenberg, who received the shares and gave petitioner Thomas W. Moses a $20,000 note. Consequently, on February 2, 1971,

---

[3]Apparently as the result of a typographical error, the parties stipulated that Thomas W. and Anne M. Moses received a total of 34,542 stock subscription rights rather than the correct number of 35,543.

petitioners Moses received 20,000 shares of Shorewood common stock pursuant to exercise of the rights they received as Water Co. shareholders. Neither the Reddings nor the Moseses reported any income from their receipt or exercise of the rights to acquire Shorewood common stock for less than its fair market value.

Respondent's primary contention is that the rights distribution on January 7, 1971, was a taxable dividend. In this regard he seeks a judicial stamp of approval on Rev. Rul. 70–521, 1970–2 C.B. 72, wherein he ruled that the distribution by a corporation to its shareholders of short-term transferable rights to acquire stock in another corporation is taxable under section 301. He would tax petitioners here on the fair market value, as of the date of distribution, of the rights that they received to acquire Shorewood stock. On this record he would attribute no particular tax consequences to the February 2, 1971, stock distribution.

Petitioners' primary argument, on the other hand, focuses on the Shorewood stock distribution. They maintain that the rights distribution was but one step in a plan to effectuate the corporate separation of Shorewood from Water Co., an integrated transaction qualifying under section 355, such that no amount is includable in their incomes. They concede that unless the two steps are considered together as an integrated transaction which meets the requirements of section 355, they realized taxable dividend income. Petitioners disagree with respondent's theory for taxation of the dividend, however. They contend that if section 355 is not applicable to them, under *Palmer v. Commissioner*, 302 U.S. 63 (1937), and *Choate v. Commissioner*, 129 F.2d 684 (2d Cir. 1942), they realized income only upon the exercise of their rights, and the amount of that income is the lesser of the difference between the subscription price paid and the fair market value of the shares of Shorewood stock they received on either (1) the date the rights were issued, or (2) the date their rights were exercised.

Though the parties differ on the rudiments of taxing rights to acquire portfolio stock, the threshold question is whether petitioners' participation in the corporate separation of Shorewood from Water Co. was within the terms of section 355. For if the rights distribution was but a step to be ignored in a section 355 transaction, we need not decide whether the rights

distribution standing alone would be a taxable event or whether the *Palmer* doctrine has viability under the 1954 Code.[4]

Section 355[5] provides that certain distributions of stock or

---

[4]Respondent dismisses petitioners' reliance upon the *Palmer* doctrine with the brief statement that the case of *Palmer v. Commissioner*, 302 U.S. 63 (1937), is inapplicable "since it dealt with rights to purchase assets of a corporation for their full fair market value." Respondent is quite correct in his perception of the facts involved in *Palmer*, but the school of thought based upon certain dicta in that case (i.e., the *Palmer* doctrine) is not limited by the fair market value distinction. See D. Carlson, "Taxation of 'Taxable' Stock Rights: The Strange Persistence of *Palmer v. Commissioner*," 23 Tax L. Rev. 129 (1968); F. Whiteside, "Income Tax Consequences of Distributions of Stock Rights to Shareholders," 66 Yale L. J. 1016 (1957). Because we resolve this case in petitioners' favor on the sec. 355 issue without reliance upon the stock rights issue in *Palmer*, we do not reach the question of the *Palmer* doctrine's current vitality.

[5]SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.

(a) EFFECT ON DISTRIBUTEES.—

(1) GENERAL RULE.—If—

(A) a corporation (referred to in this section as the "distributing corporation")—

(i) distributes to a shareholder, with respect to its stock, or

(ii) distributes to a security holder, in exchange for its securities, solely stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,

(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),

(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

(D) as part of the distribution, the distributing corporation distributes—

(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or

(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax,

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

(2) NON PRO RATA DISTRIBUTIONS, ETC.—Paragraph (1) shall be applied without regard to the following:

(A) whether or not the distribution is pro rata with respect to all of the shareholders of the distributing corporation,

(B) whether or not the shareholder surrenders stock in the distributing corporation, and

(C) whether or not the distribution is in pursuance of a plan of reorganization (within the meaning of section 368(a)(1)(D)).

(3) LIMITATION.—Paragraph (1) shall not apply if—

(A) the principal amount of the securities in the controlled corporation which are received exceeds the principal amount of the securities which are surrendered in connection with such distribution, or

(B) securities in the controlled corporation are received and no securities are surrendered in connection with such distribution.

For purposes of this section (other than paragraph (1)(D) of this subsection) and so much of section 356 as relates to this section, stock of a controlled corporation acquired by the distributing corporation by reason of any transaction which occurs within 5 years of the distribution of such

securities of a corporation controlled by the distributing corporation do not result in recognizable gain or loss to, or any amount includable in the income of, recipient shareholders or security holders. The conditions under which the general rule is applicable are set forth in subparagraphs (A) through (D) of subsection (a)(1) and elaborated upon in the other provisions of the statute. The parties have by stipulations and concessions narrowed our inquiry in this case considerably. They agree that Water Co.'s distribution of Shorewood stock was not a transaction used principally as a device for the distribution of the earnings and profits of either corporation, the requirement imposed by subparagraph (B), and that the active business requirements referred to in subparagraph (C) were satisfied. Likewise, for purposes of subparagraph (D), it is stipulated that the 1,069,537 Shorewood shares distributed on February 2, 1971, was an amount of stock constituting control within the meaning of section 368(c), and that Water Co.'s retention of certain

---

stock and in which gain or loss was recognized in whole or in part, shall not be treated as stock of such controlled corporation, but as other property.

(4) Cross reference.—

For treatment of the distribution if any property is received which is not permitted to be received under this subsection (including an excess principal amount of securities received over securities surrendered), see section 356.

(b) Requirements as to Active Business.—

(1) In general.—Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, or

(B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporations and each of the controlled corporations in engaged immediately after the distribution in the active conduct of a trade or business.

(2) Definition.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

(D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business—

(i) was not acquired directly (or through one or more corporations) by another corporation within the period described in subparagraph (B), or

(ii) was so acquired by another corporation within such period, but such control was so acquired only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period.

Shorewood shares was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax. Furthermore, there was a valid business purpose for both the corporate separation and the particular method by which it was carried out, and Water Co. shareholders have continued to maintain a continuity of interest in Shorewood after the separation. See sec. 1.355–2(c), Income Tax Regs. Finally, there is no question but that petitioners were shareholders in the distributing corporation, that Shorewood was a controlled corporation, and that as part of the corporate separation petitioners received no property other than rights to acquire Shorewood stock, and upon exercise of their rights, shares of Shorewood stock.

The parties' point of departure is centered around the restrictions of subparagraph (A) that only stock or securities of a controlled corporation that are distributed to a shareholder with respect to the stock of the parent are entitled to be received without inclusion in income. In statutory terms, the questions argued on brief are (1) whether petitioners received "solely stock or securities" of Shorewood, and if so, (2) whether Water Co. distributed the Shorewood stock to petitioners "with respect to its stock."[6] Respondent has attempted to raise an alternative argument in his reply brief that the "distributes" requirement of subparagraph (D) has not been satisfied if the transaction is found to be part sale and part distribution. Although we do not ordinarily consider issues raised for the first time on brief, inasmuch as we would be unable to give effect to a stipulation to an erroneous conclusion of law (*Littauer, et al., Executors v. Commissioner*, 25 B.T.A. 21, 28 (1931)), and because no facts not in evidence are necessary to decide the issue (*Anderson v. Commissioner*, 156 F.2d 591 (2d Cir. 1946)), we could treat the question of compliance with subparagraph (D) as being properly before us. However, the item which is, and should be, in issue is compliance with *Code* section 355(a)(1)(A). In fact respondent, also in his reply brief, "readily admits that if the Indianapolis Water Co. satisfied the requirements of Code section 355(a)(1)(A), the petitioners are entitled to treat the dividends they received as tax free." The stipulation of facts has settled

---

[6]Though we ultimately resolve the question in favor of petitioners, our use of the word "distribute" and its derivatives throughout the opinion should not be taken as a prejudgment of the issue.

the questions of compliance with the "device" restrictions of subparagraph (B), with the "active business" requirement of subparagraph (C), and with the "control" requirements of subparagraph (D). The mere use of the word "distributes" in subparagraph (D) was not intended to be any different from the use of that word in subparagraph (A). S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 266 (1954). Fulfillment of the "distributes" requirement in subparagraph (A) would satisfy that requirement of subparagraph (D) as well. Further, failure of Water Co. to satisfy subparagraph (A) would dispose of petitioners' claim. Therefore, we need not and will not separately consider the "distributes" language relative to subparagraph (D).

Whether a distributing corporation's use of stock rights allowing its shareholders to purchase stock in a controlled subsidiary at less than its fair market value can satisfy the requirements of section 355(a)(1)(A) has been litigated only once before. In *Baan v. Commissioner*, 45 T.C. 71 (1965), the taxpayers were stockholders in Pacific Telephone & Telegraph Co. (Pacific) and in that capacity received transferable short-term rights to acquire stock in Pacific Northwest Bell Telephone Co. (Northwest), a wholly owned subsidiary of Pacific. In order to acquire a single share of Northwest stock, it was necessary to surrender six rights and pay $16 in cash. The Northwest stock had a value substantially in excess of the $16 subscription price, both on the date the rights were issued and on the date the taxpayers exercised their rights. The Commissioner determined deficiencies based on the taxpayers' having received dividend income equal to the spread between the $16 subscription price and the value of the Northwest shares on the date the rights were exercised, the spread being lower at that time than on the date the rights were issued. (See *Baan v. Commissioner*, 45 T.C. at 87 n. 4.) The taxpayers argued that the transaction was completely tax free under section 355. We agreed with the taxpayers, holding inter alia, that the Northwest stock, rather than the rights, was the subject of the distribution within the meaning of section 355(a)(1)(A), and that the intercession of the stock rights scheme did not prevent the distribution of North-

west stock to them from being "with respect to" their ownership of stock in Pacific.[7]

*Baan* was a consolidated proceeding in this Court involving two taxpayers. The Commissioner appealed our decisions to the Courts of Appeals for the Second and Ninth Circuits.[8] In affirming our decision sub nom. *Commissioner v. Gordon*, 382 F.2d 499 (2d Cir. 1967), the Second Circuit held that the distribution of Northwest stock was the relevant event for tax purposes and the use of the stock rights as a mechanism to accomplish that distribution should be disregarded. The court further held that the requirement of cash consideration to participate in the stock distribution did not violate the statutory directive that the distributing corporation distribute the stock of its subsidiary "with respect to its stock."[9] The Ninth Circuit, however, in *Commissioner v. Baan*, 382 F.2d 485 (9th Cir. 1967), reversed our decision as to the transaction's meeting the section 355(a)(1)(A) test. It found, in accordance with the Commissioner's argument, that the stock rights issued to the taxpayer were not "stock or securities" and, accordingly, the distribution of those rights could not qualify for nonrecognition treatment under section 355. But that did not dispose of the issue. The court assumed, without deciding, that the use of a stock rights scheme, standing alone, would not prevent the transfer of Northwest stock from Pacific to its shareholders from constituting a distribution "with respect to its stock." The fatal flaw, in that court's view, was the requirement of a $16 payment for each Northwest share; it held that that payment converted the stock distribution into a sale of corporate assets, and that a sale is not within the phrase "distributes * * * with respect to its stock."

The cases were reconsolidated on certiorari to the Supreme Court, where, as to the applicability of section 355, the judgment of the Ninth Circuit was affirmed and the judgment of the Second Circuit was reversed. *Commissioner v. Gordon*, 391 U.S. 83 (1968). The basis for decision was, however, an issue raised for

---

[7]We also rejected the Commissioner's contention that Pacific did not "distribute" the Northwest stock as required by sec. 355(a)(1)(D).

[8]Each step in the *Baan* litigation involved issues not presented in this case. Our discussion of that litigation is accordingly limited to those matters which bear upon the questions now before us.

[9]Judge Friendly, in dissent, found it unnecessary to reach the sec. 355(a)(1)(A) issue, but suggested that the Northwest stock was distributed "with respect to" the rights rather than the Pacific stock.

the first time in the Courts of Appeals. The Supreme Court did not reach the issues now before us.[10]

Petitioners urge that under the Court policy announced in *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), we are bound to our holding in the initial *Baan* case because it was affirmed on the current issues in the Second Circuit, and the Court of Appeals for the Seventh Circuit, to which an appeal in this case would normally lie, has not been confronted with the issues. For precisely the reason that the Seventh Circuit has not ruled on the issues, however, that policy is inapplicable. *Hughes v. Commissioner*, 65 T.C. 566, 569 (1975). Nevertheless, absent some indication of the need for self-correction, the policy of stare decisis operates in petitioners' favor. *Helvering v. Hallock*, 309 U.S. 106 (1940).

Respondent does not argue that the facts in *Baan*, as pertinent to the questions before us here, are distinguishable from the facts in this case, nor do we find them to be so. In both cases the taxpayer-petitioners, as shareholders in a distributing corporation, received from that corporation transferable short-term rights to acquire stock in a controlled subsidiary for less than its fair market value. Upon exercise of the rights so received and payment of the necessary cash consideration, each taxpayer received stock in the controlled subsidiary. Respondent does argue, however, that the precedential value of our opinion in *Baan* has been eroded by its subsequent judicial history.

Respondent submits that the Supreme Court set forth the guiding principle for proper application of section 355 to the facts of this case in *Commissioner v. Gordon*, 391 U.S. at 91–92, where, with reference to section 355, it said: "The requirements of the section are detailed and specific, and must be applied with precision." The underlying rationale of respondent's position is that a stock rights scheme by its very nature offends the detailed and specific requirements of section 355. He pursues his

---

[10]The Supreme Court's holding was extremely narrow. It held that the subpar. (D) requirement that the controlling corporation distribute all of its stock and securities in, or 80-percent control of, the controlled corporation was not satisifed by an initial distribution of less than the requisite amount in the absence of a binding commitment to make further distribution. Following the Supreme Court's decision, the cases were remanded to this Court to consider alternative contentions advanced by the taxpayers but not considered when the cases were first here. *Baan v. Commissioner*, 51 T.C. 1032 (1969), affd. sub nom. *Gordon v. Commissioner*, 424 F.2d 378 (2d Cir. 1970); *Baan v. Commissioner*, 450 F.2d 198 (9th Cir. 1971).

position on two levels: (1) The interjection of stock rights prevents compliance with the literal terms of section 355(a)(1)(A), and (2) Congress did not intend to allow the use of stock rights in a transaction qualifying under section 355. The arguments presented on these points are not, however, mutually exclusive; each of the reasons respondent asserts that section 355(a)(1)(A) is offended in this case would, if correct, effectively prohibit the use of stock rights as a mechanism in a section 355 transaction. Respondent further submits that the rights distribution had "independent legal significance," thus making step transaction analysis inappropriate since there was no guarantee made when the rights were distributed that subscription for over 80 percent of the Shorewood stock would occur.

Respondent is mistaken in his treatment of this case. First, the applicability of our decision in the *Baan* case to the facts of this case has in no way been reduced by any decision in the extensive litigation of *Baan*. The Second Circuit affirmed; the Ninth Circuit reversed. These cases are merely persuasive authority in this instance, since an appeal in this case would normally lie in the Seventh Circuit. While the authority of the Supreme Court could have prevented the use of our decision in *Baan*, it does not do so here. Deciding to affirm our reversal by the Ninth Circuit on an issue not before us in *Baan*, nor before us here, the Supreme Court *did not reach or decide the issues in the instant case*.[11] Therefore, our decision in *Baan* and the principles announced therein are applicable here. Further, the Supreme Court's call for "precision" application of section 355 does not mean that we must interpret the lack of specific provisions for the use of stock rights in a corporate separation under section 355 as legislative disapproval of such a mechanism.

We must also disagree with respondent's analysis of the significance of the rights distribution. It must be remembered that whether the step transaction doctrine applies determines whether a particular step has independent legal significance, not vice versa. Although it is true that a failure to distribute 80 percent or more of Shorewood's stock on February 2, 1971, or a

---

[11]See n. 10 *supra*. In the instant case, distribution of over 80 percent of Shorewood stock occurred in a single transaction of approximately 1 month.

failure to fulfill any other statutory requirement would have made petitioners ineligible for section 355 treatment,[12] we still decide tax consequences, however, on the basis of what has taken place, not what might have occurred. *Central Tablet Manufacturing Co. v. United States*, 417 U.S. 673, 690 (1974); *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 148–149 (1974). That different tax consequences would ensue if section 355 were inapplicable to the transaction for other reasons hardly provides a basis for resolving whether the stock rights scheme offends the statute. Further, the tax consequences of a rights distribution which is not an integral part of a corporate separation qualifying under section 355, whatever they may be (compare *Commissioner v. Gordon*, 391 U.S. at 98, with Rev. Rul. 70–521, 1970–2 C.B. 72), are not controlling here. Cf. *Sage v. Commissioner*, 83 F.2d 221 (2d Cir. 1936)(what would otherwise have been a taxable dividend was not taxable because it was merely a step in a plan of reorganization).

As a general matter, a series of related steps designed and executed as part of a unitary plan to achieve a particular result is to be viewed as a whole, whether the effect of so doing is relief from or imposition of tax, where the substance of the transaction is comprehended within a pertinent revenue statute. *Kuper v. Commissioner*, 533 F.2d 152, 155–156 (5th Cir. 1976); *King Enterprises, Inc. v. United States*, 418 F.2d 511, 516–517 (Ct. Cl. 1969). Cf. *Atlee v. Commissioner*, 67 T.C. 395 (1976) (viewed as an integrated whole, several steps failed to meet the requirements of section 355).

Respondent correctly points out that there was no binding commitment for a stock distribution to follow the rights issuance. However, as well stated by the Court of Claims in *King Enterprises, Inc. v. United States, supra* at 518, the requirement by the Supreme Court in *Gordon* of a binding commitment was pronounced in a limited context and should be interpreted in the same limited manner. Application of that requirement to all other situations would practically eliminate the step transaction doctrine. That requirement will not be applied to this case.

The issuance of the rights by Water Co. was merely a

---

[12]This statement is framed to respond to the argument on the facts of this case and should not be taken as expressing any opinion on the validity of multistep divestitures under section 355.

procedural device to give Water Co. shareholders the opportunity to be included or excluded from the Shorewood stock distribution by their own decision. These rights existed only for a short period of time and only for this very limited purpose. Thus, their distribution was merely a brief transitory phase of the corporate separation. See *Helvering v. Alabama Asphaltic Limestone Co.*, 315 U.S. 179 (1942). Inclusion of this step in the overall stock distribution plan by Water Co. has in no way offended the purpose of section 355. Under the facts of this case, manipulation of the instant situation for tax avoidance purposes cannot be found to have existed. On the contrary, petitioners readily admit, as they must, given the facts, that the distribution of Shorewood stock would have been taxable if not for compliance with section 355.[13]

As a result of the completed transaction (once petitioners had exercised their rights), petitioners held only Shorewood stock. They were given nothing else. Further, as the Supreme Court has found, the payment of cash in the exercise of those rights would not prevent the transaction from being a distribution.[14] Accordingly, we find that a distribution of Shorewood stock alone resulted from the transaction examined here.

Finally, we find that the stock distribution to petitioners was made "with respect to Water Co. stock" and thus satisfies the remaining element of subparagraph (A). It is inconsequential to the determination of this question that other shareholders may have elected out of the stock distribution by selling or otherwise failing to exercise their rights and that other distributees may not have received Shorewood stock in a shareholder capacity. Cf. Rev. Rul. 68–21, 1968–1 C.B. 104 (portfolio stock was offered on a pro rata basis to shareholders of X corporation in partial redemption of their X corporation stock; shareholders owning 35 percent of X stock availed themselves of the offer; distribution was made by reason of the corporation-shareholder relationship).

---

[13]The Supreme Court agreed with this conclusion when, facing a similar problem, it said:

"Whether the actual dividend occurs at the moment when valuable rights are distributed or at the moment when their value is realized through sale or exercise, it is clear that when a corporation sells corporate property to stockholders or their assignees at less than its fair market value, thus diminishing the net worth of the corporation, it is engaging in a "distribution of property" as that term is used in § 316. Such a sale thus results in a dividend to shareholders *unless some specific exception or qualification applies.* [*Commissioner v. Gordon,* 391 U.S. 83, 89–90 (1968); fn. ref. omitted, emphasis supplied.]"

[14]See n. 13 *supra; Palmer v. Commissioner,* 302 U.S. 63, 69 (1937).

It cannot be denied that petitioners' status as Water Co. shareholders had some bearing upon their receipt of Shorewood stock. They were a part of that group which exercised rights in sufficient numbers to satisfy subparagraph (D). Viewing the process as a single transaction, we will not penalize petitioners because of their fleeting status as warrant holders during the swift implementation of that transaction.

In light of the discussion above, we will adhere to our conclusion in *Baan* that petitioners' receipt of the stock rights as an integral part of the transaction does not offend the provisions of section 355. We find nothing in the complex judicial history of the *Baan* litigation, aside from the Ninth Circuit, which would indicate any need for self-correction on these issues.

It is not questioned that Water Co. distributed stock rights to petitioners on January 7, 1971, with a view toward as it subsequently did, divesting itself of over 80 percent of Shorewood's stock on February 2, 1971. The rights were of use only for participation in the February 2 distribution. At the completion of the transaction, the only property petitioners held as a result of their participation was Shorewood stock. To the extent they acquired that stock for less than adequate consideration, they did so by reason of their status as Water Co. shareholders. The device clause and active business requirements of the statute were admittedly satisfied. There was a business purpose for both the corporate separation and the particular method by which it was carried out. Under these circumstances, we think the rights distribution is properly ignored in determining petitioners' tax consequences from the transaction. We decline respondent's invitation to equate the absence of statutory language in section 355 specifically authorizing the use of stock rights as a mechanism in a corporate separation with congressional disapproval of such action.

Our holding of course goes no further than the facts of this case. Cf. *Kansas Sand & Concrete, Inc. v. Commissioner*, 56 T.C. 522, 530 (1971), affd. 462 F.2d 805 (10th Cir. 1972). No Water Co. shareholders who sold their rights or who exercised rights acquired in the market are before us. Likewise, we find it unnecessary to consider the validity of Rev. Rul. 70–521, 1970–2 C.B. 72. We conclude only that based upon the record before us the distribution of Shorewood stock to petitioners, pursuant to their exercise of stock subscription rights issued to them as an

integral part of the ultimate stock distribution, complies with the terms of section 355 as written and intended.

*Decisions will be entered for the petitioners.*

Reviewed by the Court.

DRENNEN, *J.*, did not participate in the disposition of this case.

STERRETT, *J.*, dissenting: In my view, the majority misconceives the reality of the transaction in issue.

The admitted goals to be accomplished by the transaction at issue were (1) at the instigation of the Indiana Public Service Commission, the divestiture of Shorewood by Water Co. and (2) the raising of additional capital for Shorewood.

To disgorge itself of subchapter C control (80 percent) of Shorewood and at the same time raise funds for its former subsidiary, Water Co. adopted a rather simple plan. It agreed to buy additional shares (855,630) from Shorewood contingent on the offering of these shares, plus a portion (213,907 out of 481,291) of the shares it already owned in Shorewood, to the holders of warrants which it intended to distribute with respect to its stock, on the basis of two warrants plus $5 for each share of Shorewood. Thus Shorewood could anticipate receiving in excess of $4 million in additional capital, Water Co. would have distributed 80 percent plus *1* share of Shorewood's outstanding stock, and received $1 million in fresh capital. A perfectly reasonable means of accomplishing the two disparate corporate goals, but simply not within either the literal or spiritual ambit of section 355.

We must note at the outset that the Supreme Court in *Commissioner v. Gordon*, 391 U.S. 83, 91–94 (1968), has instructed us to construe section 355 narrowly:

Section 355 provides that certain distributions of securities of corporations controlled by the distributing corporation do not result in recognized gain or loss to the distributee shareholders. The requirements of the section are detailed and specific, and must be applied with precision * * * . Congress has abundant power to provide that a corporation wishing to spin off a *subsidiary must, however bona fide its intentions, conform the details of a distribution to a particular set of rules.* [Emphasis added.]

In the instant case, the petitioners received property in the form of warrants with respect to their Water Co. stock that had independent value since the warrants entitled them to a bargain purchase of Shorewood stock. Normally, this would constitute a distribution of property taxable as a dividend either at the time of receipt or at the time of sale or exercise. *Palmer v. Commissioner*, 302 U.S. 63 (1937).

Petitioners seek to avoid this result by applying the step or integrated transaction theory to couple the warrant distribution with the subsequent exchange of two warrants and $5 for 1 share of Shorewood stock. Petitioners' argument can fairly be paraphrased in terms that they contend that, since the warrants were distributed with respect to the Water Co. stock and since the use of the warrants to obtain Shorewood stock was an integral part of the warrant distribution plan, Shorewood stock then must also have been distributed with respect to Water Co. stock.

I cannot accept petitioners' rationale. I believe that the stock warrant issuance herein must be given independent significance and cannot simply be ignored because accompanied by an apparent spinoff. Further, I believe that, even if the rights issuance does not totally contaminate the purported section 355 divisive reorganization, the transaction before us still fails to qualify under section 355 because it has not been shown that the requisite control was distributed.

I must comment here that, while the majority attempts to limit the effects of its opinion by assuring us that it "goes no further than the facts of this case," *Redding v. Commissioner*, 71 T.C. 597 (1979), the principles announced by the majority are not so limitable. They will apply equally to, and will affect the tax treatment of, all the shareholders of both Water Co. and Shorewood. It is irrelevant that petitioners sold none of their rights, exercised all of them, and received stock therefor (with the additional consideration of $5 cash per Shorewood share). Rather, our treatment of petitioners should depend on the substance of the transaction as a whole.

The majority finds that the "issuance of the rights by Water Co. was merely a procedural device to give Water Co. shareholders the opportunity to be included or excluded from the Shorewood stock distribution by their own decision." *Redding v. Commissioner, supra* at 612. But the rights issuance was much

more than a mere "procedural device," it was the method through which Water Co. intended to obtain the capital funding for Shorewood (and possibly itself) which was one of the primary purposes behind the whole transaction. Further, the very words quoted above indicate that the rights issuance was much more than a mere procedural device to all the shareholders of Water Co. at the time of the issuance. For these shareholders, the rights issuance was a turning point—they could choose to pay $5 per Shorewood share and keep what they already owned, or could almost certainly sell the rights at a profit and lose their ownership interest in Shorewood, thereby surrendering the opportunity of buying Shorewood stock at a bargain. The shareholders could sell the rights only because they were valuable property interests and because, as Water Co. had "expected" and planned for, they were traded over the counter.

Indeed, Shorewood stated in the prospectus dated January 7, 1971, issued with respect to the warrant distribution, that it "expected" that such trading would occur. Water Co. and Shorewood arranged for a "subscription agent" to be available to Water Co.'s warrant holders (regardless of whether they were shareholders) to facilitate the sale and exchange of these rights. It is clear, therefore, that Water Co. anticipated that some, perhaps many, of its shareholders would for one reason or another choose not to exercise the rights issued to them and wanted to facilitate the transfer of these rights into the hands of persons who would exercise them. Thus, the use of transferable stock rights was one of the primary methods Water Co. used to attract new capital to the entire Shorewood/Water Co. corporate enterprise.

When we think of an integrated transaction, we think of steps bound together, perhaps legally so, with no uncertainty from one step to the next. Here there was no absolute requirement that the shareholders exercise the warrants. Admittedly, the warrants were freely transferable and entitled the holder to a bargain purchase of Shorewood stock. Hence the probabilities were, from a practical point of view, that the warrants would be either exercised or sold. Nonetheless, to get Shorewood stock required an affirmative act on the part of each warrant holder which he was under no compulsion to take.

Thus, I object to the majority's conclusion that the rights issuance was of no independent significance. The transfer by

Water Co. of Shorewood stock to Water Co. warrant holders was clearly conditioned on the payment of the $5 cash consideration per share. This was the transfer of property in consideration for the payment of money. In the *Baan* case on remand, *Baan v. Commissioner*, 51 T.C. 1032, 1037 (1969), affd. 450 F.2d 198 (9th Cir. 1971), affd. sub nom. *Gordon v. Commissioner*, 424 F.2d 378 (2d Cir. 1970), this Court found an almost identical transaction to be a "sale." Given the majority's restrictive view of the impact and import of the Supreme Court decision in *Commissioner v. Gordon, supra* at 83, this was not a holding requirement by that opinion and can only be interpreted as a shift in position by this Court.[1]

Even if there was a "distribution" of stock within the meaning of section 355, and a further consequence of the issuance of warrants, it was not solely of Shorewood stock with respect to Water Co. stock. See sec. 355(a)(1). It is clear that Water Co.'s plan did not call for the distribution of stock to shareholders— and that the "distribution" of stock that did occur was not in respect of any stock in Water Co. The prerequisite to obtaining Shorewood stock was not the status of a Water Co. shareholder, but rather the status of a holder of warrants which may, or may not, have been obtained by reason of Water Co. stock ownership. See *Commissioner v. Gordon*, 382 F.2d 499, 513 (2d Cir. 1967) (Judge Friendly's dissenting opinion). Indeed, while it is not certain from the record, it is certainly probable that many of the warrants sold over the counter went into nonshareholder hands.[2] How can it be claimed that the exchange, between Water Co. and a nonshareholder third party, of Shorewood shares in return for $5 and two warrants was "actually" a distribution to a distributing corporation shareholder with respect to his stock?

A second point: Even assuming that an integrated transaction took place, petitioners still fail to meet the narrow requirements of section 355. Section 355(a)(1)(A) requires, in relevant part, that only stock of a controlled corporation may be distributed to the shareholders of the distributing corporation with respect to their stock in the distributing corporation. This may be thought

---

[1] If the transaction is viewed as the issuance by Shorewood of its stock through the medium of Water Co. acting as a conduit, then only this sale of the 213,907 Shorewood shares already owned by Water Co. could produce gain. Sec. 1032.

[2] Under any circumstance, it was the petitioners' burden to prove that the probability did not occur. This they did not do.

of as the "to whom" of the distribution requirement. Section 355(a)(1)(D) describes what has to be distributed. That subparagraph requires that, at a minimum, stock constituting "control" of the controlled corporation within the meaning of section 368(c) must be distributed to shareholders of the distributing corporation. I do not believe that, on this record, we know to whom "control" was "distributed." Of the 1,336,921 shares of Shorewood issued and outstanding after the transaction under consideration, Water Co. retained 267,384 shares or exactly 20 percent, less 1 share, of the total. It must, therefore, have distributed a shade more than 80 percent, as is found by the majority. But the statute, when "applied with precision" (*Commissioner v. Gordon*, 391 U.S. at 92–93), does not merely require a "distribution"—it requires distribution of "control." Beyond that, it requires distribution of control to *shareholders of the distributing corporation*. Sec. 355(a)(1)(A) and (D). But apparently there was no distribution of "control" to anyone herein, let alone Water Co.'s shareholders, because "control" was presumably destroyed by the transfer itself.

The majority found that Water Co. kept 267,384 shares of Shorewood common. It also found that "shareholders or their transferees or assignees subscribed to all 1,069,537 Shorewood shares offered, *except* for 50,000 shares acquired by the underwriters." (Emphasis added.) *Redding v. Commissioner, supra* at 600. The clear import of the language is that *at most*, assuming that all the warrant transferees were also shareholders, 1,069,537 less 50,000 shares, or 1,019,537 shares, were acquired by Water Co. shareholders. This is approximately 76.26 percent of all the Shorewood shares issued and is not "control" within the meaning of section 368(c). In order to sustain the Court's decision herein one would have not only to ignore the substance and importance of the rights issuance, but also assume that all the rights traded over the counter and all the underwriters were also Water Co. shareholders. I cannot join in this assumption and it seems, in any event, to be contrary to the above-quoted language. The petitioner has not shown to whom Water Co. transferred "control" inasmuch as no one related group of distributees had 80 percent of Shorewood's stock immediately after the transfer. It is not this Court's function to assume petitioners' prima facie case. Rather, such case must be proven.

To summarize, I do not believe that two legally freestanding steps can be run together and I am of the opinion that the realities are that the Shorewood stock was distributed with respect to warrants and not with respect to stock of Water Co. Hence the provisions of section 355(a)(1)(A) are not met. Furthermore, and in part for the same reason, I am unable to conclude from the record herein that Water Co. distributed, with respect to its stock, 80 percent of Shorewood to its shareholders in conformance with the requirements of section 355(a)(1)(A) and (D).