CHRISTOPHER DYESS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dyess v. Commissioner
Docket No. 28345-89
United States Tax Court
T.C. Memo 1993-219; 1993 Tax Ct. Memo LEXIS 226; 65 T.C.M. (CCH) 2717; May 20, 1993, Filed *226 Decision will be entered under Rule 155. For petitioner: Harris H. Barnes III. For respondent: Donald R. Gilliland. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year 1982 in the amount of $ 9,002.78 and additions to tax as follows: Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661 $ 2,250.70
$ 774.24
*
$ 2,250.70
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, [1] the issues remaining for decision are: (1) Whether petitioner, relying on substance over form or the step transaction doctrine, can avoid the application of section 707(b)(2)(B), which provides that the gain on the transfer of real property between two partnerships having over 80-percent common *227 ownership is considered ordinary income; and (2) Whether petitioner can use the "interim closing of the books" and mid-month convention accounting methods to reduce the proscribed common ownership below the 80 percent level; and (3) Whether petitioner is liable for an addition to tax for negligence or intentional disregard of rules or regulations under section 6653(a)(1) and (2). *228 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Dallas, Texas, at the time the petition was filed. Petitioner has been a revenue agent with the Internal Revenue Service (IRS) since 1986. Petitioner underwent an employee audit when he began his employment with the IRS, which audit gave rise to this case. Before 1982, petitioner received an accounting degree, but was not engaged in the practice of accounting during 1982. He was employed as a real estate broker and property manager by Donald R. Nace, Inc., a real estate company in Hattiesburg, Mississippi. Petitioner and Donald R. Nace purchased real estate properties in the Hattiesburg area for management and investment. Equity Investments (Equity) is a general partnership formed in 1980 by petitioner, Donald R. Nace (Nace), and three other investors to acquire and manage rental property. Equity eventually owned substantial amounts of developed and undeveloped real estate in Hattiesburg, including single-family residences, multi-family residential property, and unimproved real *229 estate. As of January 1, 1982, the partners of Equity and their ownership interests were as follows: Partner
Ownership Interest
Petitioner
18 percent
Donald R. Nace [2]
52 percent
Dale L. Nace
15 percent
Malry D. Rolison
15 percent
By February 15, 1982, petitioner had bought the partnership interests of Dale L. Nace and Malry D. Rolison, thereby increasing his partnership interest to 48 percent. From February 15, 1982, through the remainder of 1982, petitioner, with a 48-percent interest, and Nace, with a 52-percent interest, were the only partners of Equity. As of 1985, petitioner and Nace had continued to be the only partners in Equity. In early 1981, Equity had completed the construction of the Foxfire Village real estate development (Foxfire Village). Foxfire Village consisted of 11 four-plex apartment buildings located on *230 11 separate lots of land. Upon completion of the development, Equity sold six of the improved lots but held the remaining five until October of 1982. During this time, the real estate market in Hattiesburg was experiencing a significant downturn. Petitioner and Nace, the partners of Equity, undertook efforts to rescue some of Equity's real estate holdings from foreclosure through the infusion of additional capital. Foxfire Village was facing foreclosure. The five improved lots of Foxfire Village still held by Equity had a negative cash flow and were subject to a construction loan mortgage having a high interest rate. To alleviate Foxfire Village's cash flow difficulties, petitioner and Nace decided to combine Equity with another partnership that owned a development known as the Cambridge Apartments. Petitioner and Nace contemplated forming a limited partnership in which Equity and the Cambridge Apartments partnership would be the general partners. Limited partnership interests could then be sold in order to raise cash. However, this arrangement was never consummated due to difficulties encountered in coordinating the transaction among all of the persons involved. At that *231 time, petitioner and Nace decided to syndicate Foxfire Village by itself as a limited partnership and to seek individuals who they felt would be interested in investing in that limited partnership. In the 1980s, syndication of apartment complexes was a very popular investment vehicle in southern Mississippi because the tax benefits were considered to be very attractive. Petitioner and Nace consulted with Robert Jackson, an attorney, and with Carl Nicholson, a certified public accountant, concerning various possible limited partnership arrangements to acquire Foxfire Village from Equity. Such consultation included consideration of the tax aspects of the transaction. In addition, such consultation included consideration of having 75 percent of the interest in the partnership held by outsiders, i.e., persons other than petitioner and Nace. In August or September of 1982, Robert Jackson (Jackson) prepared a draft of a limited partnership agreement. That draft version of the agreement provided that petitioner and Nace would be general partners with 12-percent and 13-percent interests, respectively. Under that draft version they were to contribute a 25-percent interest in Foxfire *232 Village to the limited partnership and were not to contribute any cash. In that draft version 10 blank lines were provided, on which the names of the limited partners, each holding a 7.5-percent interest, were to be inserted. Under the terms of that draft version, the limited partners were to make capital contributions totaling $ 150,000. That draft agreement also provided as follows: It is understood and agreed by and between all of the partners hereto that the Limited Partnership, once the contributed capital of $ 150,000.00 has been received, shall purchase an undivided seventy-five per cent (75%) interest in the * * * property [Foxfire Village] from the General Partners for said $ 150,000.00 in cash. The General Partners will then contribute their undivided twenty-five per cent (25%) interest in and to said property to the Limited Partnership. After the same has been accomplished, the Limited Partnership will own all of the above-described real property, with the Limited Partners having contributed $ 150,000.00 pro-rata in cash, and the General Partners having contributed the said undivided twenty-five per cent (25%) interest in the * * * property.
However, that *233 draft version of the partnership agreement was not used. On October 4, 1982, a different version, the final limited partnership agreement (the Agreement), was executed by petitioner, Nace, and Jerri D. Laube (Laube). [3] Foxfire Village, Ltd. (Foxfire) is the Mississippi limited partnership formed on October 4, 1982, for the purpose of acquiring Foxfire Village from Equity. The Agreement provided for a specific percentage of ownership interest for each of three partners. That percentage constituted both the percentage interest in the capital and the distributions and in profit and loss sharing. *234 The Agreement reflects ownership interests as follows: Partner
General Interest
Limited Interest
Petitioner
12 percent
33.75 percent
Donald R. Nace
13 percent
33.75 percent
Jerri D. Laube
--    7.50 percent
The Agreement provides that petitioner and Nace would contribute a total of $ 50,000 in cash or demand notes as general partners and that the limited partners would make the following capital contributions in cash or demand notes: petitioner, $ 67,500; Nace, $ 67,500; and Laube, $ 15,000. Accordingly, petitioner and Nace each contributed a note of $ 25,000 for his general interest and a note of $ 67,500 for his limited interest. Laube contributed $ 15,000 in cash. The Agreement further states that: It is the stated intention of the General Partners to purchase all of the property owned by the said Donald R. Nace and Chris Dyess in Foxfire Village Subdivision for the approximate sum and amount of $ 588,700.00, (the actual sum being the exact debt owed plus $ 200,000.00 equity), [4], the fair market value thereof.
*235 With respect to the sale of a general or limited partnership interest, the Agreement provides that: Should the General Partners or the Limited Partners wish to sell their interest in the Partnership, then the selling partner shall determine the selling price and shall offer the same to all of the remaining partners pro-rata according to their distributive share percentage. Any interest remaining after this option shall then be offered to the remaining partners in any ratio. The selling partner will then have the right to sell any remaining Partnership interest to the general public but only upon the same terms and conditions as contained in the offer made to the remaining partners. Should the selling price be reduced for the general public, then the selling partner shall be obligated to first offer the reduced price to the remaining partners in the sequence delineated hereinabove. Should any portion of any Partnership interest be sold to the general public, then the remaining partners agree to accept such purchaser as a partner under the terms of this agreement.
The Agreement also contains further restrictions on the disposition of a partnership interest: No Partner *236 shall have the right to sell, assign, pledge, hypothecate or otherwise convey or encumber all or any part of the Partnership interest owned and held by such Partner without the prior written approval and consent of all of the other Partners first having been obtained. * * *
A letter, dated October 4, 1982, addressed to petitioner and Nace, purports to waive those restrictions (the Letter). The Letter, in its entirety, reads as follows: It is the understanding of the undersigned that you owned, as of the date of the execution of the Limited Partnership Agreement of Foxfire Village Limited, a 67 1/2 per cent interest, as Limited Partners. It is further our understanding that you intend to sell said 67 1/2 per cent interest, as Limited Partners, to other individuals in increments of not less than 7 1/2 per cent each. We understand that said Limited Partnership Agreement contains prohibitions against the sale or assignment by any Partner of his or her interest without having first obtained written permission to do so. The undersigned do hereby consent to the sale of all of your collective Limited Partnership interest in Foxfire Village, Ltd., and we do hereby waive any rights *237 that we have pursuant to the Limited Partnership Agreement to purchase any part thereof. This consent to the sale shall continue until the two of you have sold your entire interest in the partnership as Limited Partners, and such consent shall extend to you only, and once sold, all of the then Limited Partners and you, as General Partners, shall be subject to the terms of said Limited Partnership Agreement.
The Letter was signed by petitioner, Nace, Laube, William and Goldie Schmidt, John and Craig Skates, Bobby and Edith Sigrest, William and Constance Gullung, and Tommy and JoAnne Palmertree. Of these signatories, only petitioner, Nace, and Laube had interests in Foxfire on October 4, 1982, pursuant to the Agreement. All of the signatures on the Letter, except those of petitioner, Nace, and Laube, were made after October 4, 1982. On October 4, 1982, Equity sold to Foxfire the five improved lots (numbers 5, 6, 7, 8, and 9) it still held in Foxfire Village. [5] After the formation of Foxfire and Equity's sale of the property to Foxfire, petitioner and Nace began to sell limited partnership interests in Foxfire for $ 15,000 each. Upon the sale of a partnership interest, the *238 proceeds would be transferred to Foxfire to reduce the notes of petitioner and Nace. Foxfire, in turn, would use the proceeds to reduce its indebtedness to Equity for the purchase of the property. Such cash proceeds received by Equity were then distributed back to petitioner and Nace to enable them to alleviate the property's negative cash flow. On October 14, 1982, the limited interests of petitioner and Nace were each reduced by 11.25 percent by sales of limited interests to William and Goldie Schmidt (7.5 percent), John and Craig Skates (7.5 percent), and Bobby and Edith Sigrest (7.5 percent). A First Amendment to Certificate of Limited Partnership was executed on October 14, 1982. [6]
*239 The Schmidts and the Sigrests had discussed the investment with petitioner before October 4, 1982, but had not agreed to participate in the partnership on or before that date. Petitioner and Nace did not have personal contact with John and Craig Skates on or before October 4, 1982, concerning the possibility of their investing in the partnership. Before the formation of Foxfire on October 4, 1982, investors had made only oral expressions of interest in purchasing limited partnership interests. None of the investors intended to acquire any such interest until after the formation of Foxfire and its acquisition of the property. These prospective investors would not commit to the investment until the partnership agreement had been prepared. They wanted to present the written agreement to their accountants and attorneys for review prior to deciding to make their investments. As of October 4, 1982, none of the investors was contractually obligated to purchase a limited partnership interest in Foxfire. None of the investors had made a down payment or deposit before his or her acquisition of an interest. Also, no firm date following the formation of Foxfire was set for the potential *240 investors to acquire their limited interests. The limited partnership interests were sold on a first-come, first-served basis to whoever presented the money first. If a new investor had appeared, ready to purchase an interest, an interest would have been sold to him or her, even if, as a result, a previously contacted person was thereby excluded from the opportunity. On November 12, 1982, the limited interests of petitioner and Nace were each reduced by an additional 7.5 percent by the sale of a 15-percent limited interest to Tommy and JoAnne Palmertree. As of December 31, 1982, petitioner held a 12-percent general and a 15-percent limited interest in Foxfire. Nace held a 13 percent general and a 15 percent limited interest in Foxfire. The remaining interests were held by Laube (7.5 percent), the Schmidts (7.5 percent), the Skates (7.5 percent), the Sigrests (7.5 percent), and the Palmertrees (15 percent). Additional limited partners were brought into the partnership in 1983. As additional limited partners were brought into Foxfire, additional amendments to the certificate of limited partnership were drafted, executed, and recorded in the county court. A total of four such *241 amendments had been executed and recorded by the time the last of the limited partnership interests had been sold in 1983. On its 1982 partnership tax return, Foxfire reported a loss of $ 16,624, which was allocated among the partners in accordance with their percentage interests as held on December 31, 1982. Petitioner reported $ 4,488 (27 percent) of this loss on his individual tax return. Equity realized a gain of $ 275,152 on its sale of Foxfire Village to Foxfire. On its partnership return for the taxable year 1982, Equity reported the entire gain as a long-term capital gain. Hugh Parker, a certified public accountant, and Carl Nicholson, the partnership's accountant, assisted petitioner in the preparation of Equity's tax return for 1982. Petitioner, as a general partner of Equity, signed that return, which was timely filed pursuant to extensions on October 15, 1983. On an amended 1982 return, prepared in July 1985 but filed on October 11, 1985, Equity subsequently reported 54.5 percent of the gain as short-term capital gain, since petitioner and Nace had acquired 30 percent and 24.5 percent, respectively, of their interests in Equity during 1982. Petitioner filed his *242 individual Federal income tax return for 1982 on February 3, 1986. [7] The return was prepared by Hugh Parker (Parker). The return was signed by both petitioner and Parker on October 13, 1984. On that return, petitioner reported ordinary income from Equity in the amount of $ 24,564 and long-term capital gains from Equity in the amount of $ 61,514. Those amounts correspond to the amounts of ordinary income and section 1231 gain appearing on the Schedule K-1 for petitioner that accompanied Equity's subsequent amended partnership return. *243 On January 29, 1987, petitioner filed an amended return for the taxable year 1982. On that amended return, petitioner decreased his income by $ 77,342, from income of $ 41,615, as originally reported, to a loss of $ 35,727. He attached the following explanation to the amended return: On 10/4/82 I transferred my 48% share of Foxfire Village Apartments (Lots 5-9) to Foxfire Village, Ltd, in exchange for a 45-3/4% share (12% gen, 33-3/4% ltd) of the Foxfire Partnership. The transfer was treated, in error, as a sale on the "Equity Investments" ptnrship return as originally filed & amended. It should have been treated as a tax free exchange.
That amended return was filed during the course of respondent's examination of petitioner's 1982 taxable year. [8]
On November 24, 1989, petitioner filed a second amended return for the taxable year 1982. That second amended return was filed to assert *244 the availability of a net operating loss carryback from 1985 which was not provided for by respondent in the notice of deficiency giving rise to this case. Respondent subsequently has recognized the availability of the net operating loss carryback to petitioner. See supra note 1. In the notice of deficiency, respondent disallowed Equity's capital gain characterization of the gain from the sale of the Foxfire Village property. Accordingly, respondent determined that, pursuant to section 707(b)(2)(B), the full $ 275,152 of Equity's gain from the sale of that property was ordinary income. The flow-through adjustments to petitioner's return, resulting from his 48-percent share in Equity, consisted of an increase in taxable income of $ 56,221 and a decrease in long-term capital gain of $ 54,560. OPINION Section 707(b)(2)(B) provides that: (2) Gains Treated As Ordinary Income. -- In the case of a sale or exchange, directly or indirectly, of property, which, in the hands of the transferee, is property other than a capital asset as defined in section 1221 -- * * * (B) between two partnerships in which the same persons own, directly or indirectly, more than 80 percent of *245 the capital interests or profits interests,
any gain recognized shall be considered as ordinary income. The parties in this case agree that the sale of Foxfire Village involved property described in section 707(b)(2), that is, property which, in the hands of the transferee, is property other than a capital asset as defined in section 1221. Thus, the issue is whether petitioner and Nace owned 80 percent or less of the Foxfire partnership on the date of the sale, thereby saving the transaction from the application of section 707(b)(2)(B). This depends upon petitioner's argument that the Court should disregard the form of the Foxfire limited partnership agreement executed on October 4, 1982, and rely upon what petitioner views as the substance of the transaction. Respondent argues that section 707(b)(2)(B) is a concisely and clearly drafted provision that must be applied as it is written. Respondent points out that section 707(b)(2)(B) provides a bright-line test and gives plain notice to taxpayers concerning when its restrictions apply. Since, on October 4, 1982, petitioner and Nace owned and controlled 100 percent of Equity and 92.5 percent of Foxfire, respondent concludes *246 that petitioner improperly classified the income he received from the sale of Foxfire Village as capital gain rather than as ordinary income as mandated by section 707(b)(2)(B). Petitioner admits that, at the time of the sale of property, he and Nace technically owned and controlled more than 80 percent of the partnership interests in Equity and in Foxfire. However, petitioner asserts that the substance of the transaction, rather than its form, dictates that the transaction be viewed not as one between related entities (controlled partnerships) but as one between Equity and a partnership of petitioner, Nace, and a sufficient number of unrelated investors (so as not to constitute controlled partnerships). Petitioner argues that the substance is readily apparent from the events leading to and occurring after the transaction and is quite different from the mechanical form of the transaction. Petitioner states that he had a commitment and prearranged plan to bring in local, unrelated investors as limited partners. The transfer of the property to Foxfire would have been futile, he says, without the completion of a series of transactions that transferred the limited interests to the *247 outside investors. Without that series, he argues, there would have been no need to create a limited partnership, in light of the fact that the whole purpose of the venture was to provide capital and liquidity to a failing real estate holding. Petitioner contends that at the time of the transaction he was holding, in an escrow-like arrangement, the limited partnership interests in conjunction with Nace merely for convenience and to avoid unnecessary expenses prior to transferring the interests to the limited partners once they had paid their capital contributions. Petitioner asserts that the holding of the limited partnership interests by himself and Nace was merely an accommodation to avoid having expensive Articles of Limited Partnership with escrow agreements. [9] Petitioner asserts that the time between the acquisition of the property and the entry of all of the limited partners was merely 30 to 45 days after October 4, 1982. [10] He contends that neither he nor Nace received any tax benefits from the holding of the limited partnership interests during this interim period. [11] Therefore, petitioner concludes that, when the substance rather than the form of the transaction is *248 considered, Equity's sale of Foxfire Village to Foxfire does not violate section 707(b)(2)(B). *249 Respondent does not dispute that petitioner is entitled to have the substance of the transaction examined, as it is an established principle of tax law that the substance of a transaction will govern over its form. Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Gregory v. Helvering, 293 U.S. 465 (1935); Kuper v. Commissioner, 533 F.2d 152, 155 (5th Cir. 1976), affg. in part and revg. in part 61 T.C. 624 (1974). Nevertheless, respondent asserts that the substance of the transaction in this case is fully consistent with its form, and that, as a result, section 707(b)(2)(B) is applicable. Respondent suggests that substance over form, specifically the step transaction doctrine invoked by petitioner, may not be applicable in cases involving provisions such as section 707(b)(2)(B) that mandate restrictive tax treatment for transactions between related parties. [12] Even if the step transaction doctrine is applicable, respondent asserts that petitioner has offered no evidence proving that the form of the partnership agreement does not comport with the substance *250 of the transaction at issue. As another rule of substance over form, the step transaction doctrine "treats a series of formally separate 'steps' as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result". Penrod v. Commissioner, 88 T.C. 1415, 1428 (1987). [13] As described in Smith v. Commissioner, 78 T.C. 350, 389 (1982): The step transaction doctrine generally applies in cases where a *251 taxpayer seeks to get from point A to point D and does so stopping in between at points B and C. The whole purpose of the unnecessary stops is to achieve tax consequences differing from those which a direct path from A to D would have produced. In such a situation, courts are not bound by the twisted path taken by the taxpayer, and the intervening stops may be disregarded or rearranged. [Citation omitted.]
Courts have applied three tests in deciding whether to employ the step transaction doctrine in a particular situation: (1) the binding commitment test, (2) the end result test, and (3) the interdependence test. Under the binding commitment test, a series of transactions are collapsed if, at the time the first step is taken, there is a binding commitment to undertake the later steps. Commissioner v. Gordon, 391 U.S. 83, 96 (1968). Under the end result test, the step transaction doctrine *252 is applicable if it appears that a series of formally separate steps are really prearranged parts of a single transaction intended from the outset to reach an ultimate result. King Enterprises, Inc. v. United States, 189 Ct. Cl. 466, 475, 418 F.2d 511, 516 (1969). The interdependence test focuses on "whether on a reasonable interpretation of objective facts the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." Redding v. Commissioner, 630 F.2d 1169, 1177 (7th Cir. 1980), revg. and remanding 71 T.C. 597 (1979) (quoting Paul, Selected Studies in Federal Taxation 200, 254 (2d series 1938)). The final limited partnership agreement for Foxfire (the Agreement) is clear and unambiguous in its language, but petitioner seeks to vary its meaning. In doing so, petitioner invokes this Court's "strong proof" rule. The strong proof rule requires that a taxpayer, who seeks to establish a position at variance with the language of the written agreement to which he or she was a party, must present more *253 than a preponderance of the evidence that the terms of the written instrument do not reflect business reality and the actual intentions of the contracting parties. Elrod v. Commissioner, 87 T.C. 1046, 1066 (1986); G C Services Corp. v. Commissioner, 73 T.C. 406, 412 (1979). Alternatively, respondent asserts that we should require petitioner to meet the Danielson standard, a parol evidence rule of substantive law that proposes that "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.". Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967). The Court of Appeals for the Fifth Circuit, to which an appeal in this case would lie, has declined to follow the strong proof rule in certain situations, applying *254 instead the Danielson approach. Spector v. Commissioner, 641 F.2d 376 (5th Cir. 1981), revg. and remanding 71 T.C. 1017 (1979), cert. denied 454 U.S. 868 (1981). In the instant case, we would reach the same result under either the strong proof rule or the Danielson rule. The uncontroverted facts of the case at issue are that, on October 4, 1982, petitioner and Nace held a combined 92.5-percent ownership in Foxfire, which on the day of its formation bought real property from another partnership (Equity) of which they owned a combined 100 percent. Petitioner and Nace gave notes to the Foxfire partnership in the total amount of $ 185,000 and executed a formal, binding partnership agreement. They were directly involved in the drafting of that agreement. The Agreement in no way suggests that there were undisclosed limited partners in Foxfire as of October 4, 1982. Petitioner argues that the Letter, which was drafted and executed to waive the requirement of the Agreement that an interest could not be sold without the prior offer to and rejection by the other partners, indicated that there *255 were other limited partners in Foxfire. We do not agree. The prospective investors who signed that Letter were, on October 4, 1982, under no legally binding commitments to become limited partners, and they actually signed the Letter sometime after October 4, 1982. The Letter, seeking to waive restrictions on the sale of a partnership interest, merely provides that additional limited partners can be brought into the partnership in the future. Neither the Agreement nor the Letter provides for the entry of limited partners on the date of the formation of the Foxfire partnership as petitioner contends. That Letter does not change the fact that, at the time of the sale of the Foxfire Village property, petitioner and Nace were the owners of 92.5 percent of Foxfire. Although the people contacted about the investment opportunity orally expressed strong interest in purchasing interests in Foxfire, they would not commit to investing until after the formation of Foxfire and its acquisition of the Foxfire Village property. These prospective investors, other than Laube, would not commit to investing before seeing the documentation of the transaction and having it reviewed by their personal *256 attorneys or accountants. Just as the potential investors were not bound to make investments, petitioner and Nace were not bound to sell to the previously contacted potential investors. They intended to sell to whoever first offered the money to purchase a limited interest. The substance or economic reality of the transaction, i.e., the infusion of capital by bringing in limited partners, was in fact accomplished by the form or structure of the limited partnership agreement that was actually used. That economic result could also have been accomplished by other forms or structures. What petitioner complains of is not the failure to achieve the substance or economic reality of the transaction, but the personal tax consequences to him of the form or structure that was used for that purpose. Petitioner had, or should have had, knowledge of the tax consequences associated with the different forms available for the structure of the limited partnership agreement. The record shows that petitioner consulted Jackson about possible forms of a limited partnership. He also consulted him about tax considerations, but the record is silent as to the nature of any tax advice he received. *257 The initial version of the partnership agreement drafted by Jackson contemplated first selling the 10 limited partnership interests for $ 150,000 and then having the partnership purchase an undivided 75-percent interest in the Foxfire Village property from Equity, with petitioner and Nace to contribute their remaining 25 percent of that property as their capital contribution. Had that structure been used, the limited partners would have held a 75-percent interest in the partnership at the time of the purchase of the property from Equity. In that event, the restriction of section 707(b)(2)(B) regarding sales of property between "controlled partnerships" would not appear to come into play. The record does not contain any satisfactory explanation as to why that draft version was not used. See supra note 3. In any event, a different version was executed, with three partners and with petitioner and Nace holding 92.5 percent of the partnership interests on October 4, 1982, the date the partnership was formed and the date of the sale of the property. Although Jackson was under the misimpression that the limited partnership interests had already been sold or virtually sold, he knew *258 the partnership would be changed as the limited partners came in. He drafted a First Amendment to Certificate of Limited Partnership with blank lines so the names of the limited partners could be added later. In fact, three more such amendments were drafted, executed, and recorded in the county court by the time the last of the limited partners had purchased their interests in March of 1983. Petitioner cannot now disavow the route he in fact followed for a different route he might have but did not take. Furthermore, one cannot find, from the face of the Agreement or from the facts as they developed, that outside limited partners were actually present and part of the partnership on the date of its formation as petitioner contends. The facts show there were no outside limited partners (other than Laube) at that time. Petitioner has met neither the strong proof test nor the Danielson test and cannot now successfully invoke the substance over form doctrine to disavow the manner in which the Foxfire partnership was structured and the limited partnership interests sold. The transaction at issue, thus, was in substance and in form a sale between related partnerships, falling under *259 the provisions of section 707(b)(2)(B). In this case, petitioner is not asking us merely to "skip, collapse, or rearrange the steps he employed[,] * * * [h]e is instead asking that we accept * * * new * * * steps or events that did not take place. The step transaction doctrine cannot be stretched so far". Glacier State Electric Supply Co. v. Commissioner, 80 T.C. 1047, 1057-1058 (1983). We must rely upon the established principle that "a taxpayer is bound by what he did and he cannot prevail upon the basis of what he could have done but did not do." Island Gas, Inc. v. Commissioner, 30 T.C. 787, 795 (1958). See also Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974), where the Supreme Court stated: This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not.
On brief, petitioner raises a new *260 argument that, under the "interim closing of the books" method, he was never in violation of section 707(b)(2)(B) as he was always deemed to have less than the prohibited percentage of ownership in Foxfire. Petitioner asserts that, when the interim closing of the books method is applied to the partnership, the outside investors, who entered the partnership on October 14, 1982, are deemed to have owned their limited partnership interests as of October 4, 1982. There is no evidence in the record to suggest that Foxfire ever used or contemplated using the interim closing of the books method. [14]
In any event, petitioner has misconstrued the purpose of the interim closing of the books accounting method. When a partner sells *261 or exchanges a portion of or all of his partnership interest, his distributive share of partnership items for the portion of the taxable year he held that interest must be determined. Sec. 706(c) and (d). Prior to the Tax Reform Act of 1976, partners who entered partnerships late in the tax year were nevertheless taking into account partnership items incurred prior to their entries (e.g., "retroactive allocations" of partnership losses). The Tax Reform Act of 1976 provided that, when partners' interests change during the taxable year, each partner's share of various items of partnership income, gain, loss, deduction, and credit is to be determined by taking into account each partner's varying interest in the partnership during the taxable year. H. Rept. 98-861 (1984), 1984-3 C.B. (Vol.2) 1, 109. Section 72(a) of Public Law 98-369, 98 Stat. 494, 589, again addressed the retroactive allocation issue, adding a new subsection (d) to section 706 (relating to taxable years of partner and partnership). Section 706(d)(1) generally provides, with exceptions for certain cash basis items, that if during any taxable year of the partnership there is a change *262 in any partner's interest in the partnership, each partner's distributive share of any item of income, gain, loss deduction, or credit of the partnership for such taxable year shall be determined by the use of any method prescribed by the Secretary by regulations which takes into account the varying interests of the partners in the partnership during such taxable year.
We have recognized that the determination of the varying interests of the partners may be made by using the interim closing of the books method, the proration method, or any other reasonable method. Richardson v. Commissioner, 76 T.C. 512 (1981), affd. 693 F.2d 1189 (5th Cir. 1982); sec. 1.706-1(c)(2)(ii), Income Tax Regs. We described the interim closing of the books accounting method in Cottle v. Commissioner, 89 T.C. 467, 495 (1987) as follows: The interim closing of the books method requires a closing of the partnership books as of the date of entry of the new partner and the computation of the various items of partnership income, gain, loss, deduction, and credit as of that date.
The interim closing of the *263 books method would not help petitioner if the books were closed "as of the date of entry" of the new partners. Petitioner essentially relies on an accounting convention to avoid the clear terms of Foxfire's limited partnership agreement and the proscription of section 707(b)(2)(B). When Congress enacted section 706(d) in 1984, it considered but did not pass a monthly convention. The legislative history of 706(d) indicates that the Senate amendment contained an explicit provision for a monthly convention: "when there is a disposition of less than an entire interest in a partnership by a partner (including entry of a new partner), the partnership may elect (on an annual basis) to determine the varying interests of the partners by using a monthly convention that treats any changes in any partner's interest as occurring on the first day of the month." H. Rept. 98-861, supra 1984-3 C.B. (Vol. 2) at 110. The conference agreement eliminated the monthly convention and determined that the statutory provision of a monthly convention as adopted by the Senate was unnecessary since the Secretary intended to provide for a monthly convention by regulation. Id. at 112. *264 The legislative history also indicates that the Secretary may provide for other conventions and "may deny the use of any convention when the occurrence of significant, discrete events (e.g., a large, unusual gain or loss) would mean that use of a convention could result in significant tax avoidance". Id.
The Commissioner issued an information release that permitted partnerships using the interim closing of the books method to use a mid-month convention, to be effective until issuance of regulations. [15]I.R.S. News Release IR-84-129 (Dec. 13, 1984). The information release was issued in 1984, after the taxable year at issue in this case and provided as follows: The Internal Revenue Service today announced that partnerships using the "interim-closing-of-the-books" method to take into account the varying interests of partners during a taxable year will be permitted to use a semi-monthly convention. * * * Under a semi-monthly convention, this [each partner's distributive share] is determined by treating partners entering during the first 15 days of the month as entering on the first day of the month and partners entering after the 15th day of the month (but before the end *265 of the month) as entering on the 16th day of the month, except to the extent section 706(c)(2)(A) of the Code applies. Partnerships that use the proration method will not be permitted to use a semi-monthly convention, but rather will be required to use a daily convention.
The release does not indicate that the mid-month convention may be used by taxpayers for tax years before 1984. The interim closing of the books method and the mid-month convention are accounting methods designed to make the computation of varying partnership interests easier when a partnership interest has been sold or exchanged during the taxable year. However, there remains the obligation to use them in a manner that ensures that the tax treatment of various partnership items reflects economic reality. The determination to be made for section 707(b)(2)(B), however, is not a matter of accounting methods or conventions. Section 707(b)(2)(B) requires that a partner's percentage ownership of *266 the capital interest or the profits interest be determined on a particular date, at the time the property is sold or exchanged, to establish the presence or absence of controlled partnerships (i.e., partnerships in which the same persons own more than 80 percent). [16] Nothing in the legislative history of section 706(d) suggests that the convention is to be extended beyond distributive share determinations to impute ownership interests for purposes of section 707(b)(2)(B). Section 707(b)(3) explicitly states that the constructive ownership rules of section 267(c) are to be used to determine percentage ownership of a capital or profits interest. In any event, as noted earlier, the record does not indicate that Foxfire used the interim closing of the books method in 1982, and therefore would not be entitled to use the mid-month convention. The parties have stipulated that, on its 1982 partnership return, Foxfire reported *267 a loss, which was allocated among the partners in accordance with ownership interests as of December 31, 1982. Thus, Equity and Foxfire constitute two controlled partnerships, and section 707(b)(2)(B) applies to the sale of Foxfire Village by Equity to Foxfire. Addition to Tax for Negligence
Section 6653(a)(1) imposes an addition to tax if any part of an underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes a further addition in the amount of 50 percent of the interest due on that portion of the underpayment attributable to the negligence or intentional disregard. "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of additions to tax under section 6653(a) is presumed correct. Petitioner bears the burden of proof on this issue. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). *268 Petitioner argues that he reasonably relied upon the tax advice of Jackson, an attorney, and the accounting advice of Nicholson, Equity's accountant, and Parker, his personal accountant. He contends that, although he does have educational training in the field of accounting, he practiced in the area of property investments and did not have expertise in tax matters. He asserts that he, thus, reasonably relied upon the experience of tax and accounting experts. While the record shows that petitioner received tax advice about the formation of Foxfire, there is no indication as to the nature of that tax advice. The duty of filing accurate tax returns cannot be avoided by delegating responsibility to an agent. Pritchett v. Commissioner, 63 T.C. 149 (1974). This principle is especially true in this case given petitioner's level of knowledge in accounting and business matters. It appears from Jackson's testimony that he thought that the limited partnership interests had been or were practically sold at the time of the formation of Foxfire. See supra note 3. Although Jackson was not questioned nor did he testify concerning whether or not he and *269 petitioner had discussed the applicability of section 707(b)(2)(B), it is important to note that a taxpayer must provide his or her adviser with complete and correct information and that any error made must be due to that adviser's mistake. Pessin v. Commissioner, 59 T.C. 473, 489 (1972). Petitioner has not shown this to be the case. See supra notes 3, 6. Respondent states that the imposition of the negligence addition to tax is also warranted because of petitioner's delinquency in filing his return. We agree. Failure to file a timely return without reasonable cause constitutes negligence or the intentional disregard of rules or regulations. Emmons v. Commissioner, 92 T.C. 342, 349 (1989), affd. 898 F.2d 50 (5th Cir. 1990). We agree that petitioner has not presented any countervailing evidence, i.e., "the existence of an adequate and reasonable excuse or justification for the delinquent filing", that rebuts respondent's determination. Emmons v. Commissioner, 92 T.C. at 350. As in Emmons, petitioner in this case has conceded the section 6651(a) late *270 filing addition, which indicates no reasonable excuse for untimely filing. The existence of a specific addition to tax provision in the Internal Revenue Code for late filing does not preclude application of the negligence addition when induced by the same late filing. Emmons v. Commissioner, 92 T.C. at 350 n. 7. Petitioner filed his individual return nearly 2-1/2 years after its due date. Petitioner states the delay was due to the inaccuracy of the Schedule K-1 for Equity. However, petitioner himself as a general partner of Equity signed Equity's original partnership return for 1982 and timely filed it within the extended period in October 1983. Petitioner's individual return for 1982 was not prepared until October of 1984. That return contained the figures shown on the K-1 accompanying Equity's amended 1982 partnership return. Equity's amended return was prepared in July of 1985 and was filed in October of 1985, after petitioner's own return had been prepared. Thus petitioner was able to, and did, prepare his own 1982 return without benefit of the subsequently amended partnership return. Moreover, even after Equity's amended partnership *271 return was filed, petitioner waited several months before filing his 1982 return, filing it in early 1986 in conjunction with his employment by IRS. We therefore sustain respondent's determination of an addition to tax pursuant to section 6653(a)(1) and (2). To reflect the above holdings and the parties' concessions, Decision will be entered under Rule 155. Footnotes
*. 50 percent of the interest due on the deficiency↩
1. By stipulation, petitioner concedes that respondent correctly determined the treatment of Equity's sale of Lot 10 of Foxfire Village as giving rise to ordinary gain of $ 18,127 and long-term capital gain of $ 12,354, as set forth in the statutory notice of deficiency. Petitioner also concedes that respondent correctly determined the treatment of the $ 3,000 rental loss issue in this case by removing it from the claimed rental loss of Equity and allowing petitioner's allocable portion of it, $ 1,440, as a short-term capital loss on Schedule D of petitioner's 1982 tax return, as set forth in the notice of deficiency. Respondent concedes that petitioner has a net operating loss from his 1985 taxable year in the amount of $ 8,348, which will be available for carryback in computing his 1982 tax liability upon resolution of the other issues in this case. On brief, petitioner concedes his liability for the addition to tax under sec. 6651(a), and respondent waives the addition to tax under sec. 6661 pursuant to her authority under sec. 6661(c).↩
2. Prior to January 1, 1982, Donald R. Nace had owned a 27.5-percent interest in Equity. On January 1, 1982, he purchased an additional 24.5-percent interest from Floyd Franks.↩
3. Neither at trial nor on brief has petitioner given a clear explanation of why changes were made from the initial draft to the final version of the Agreement. Petitioner did testify that, if Foxfire had been formed with the 75-percent limited partnership interests in the hands of outsiders, as contemplated by the initial draft agreement, he would not have been able to set a specific date for the execution of the agreement and the formation of the partnership. Jackson testified that petitioner and Nace conveyed to him the impression that the limited partnership interests were sold and that they needed an entity and documentation established to present to the limited partners, so "we went ahead and did it this way".↩
4. The $ 200,000 equity presumably includes the $ 50,000 from the two general partners and $ 15,000 each from 10 limited partnership interests.↩
5. The parties agree that this property was property described in sec. 707(b)(2), that is, property which, in the hands of the transferee, is property other than a capital asset as defined in sec. 1221.↩
6. Jackson testified that he had drafted this amendment and left blank lines to insert the limited partners' names so that petitioner and Nace could quickly add these investors to the partnership. Jackson viewed petitioner's and Nace's retention of the limited interests as a temporary holding, similar to a trust, for the investors who had "pretty much [bought] at that point". Jackson testified that petitioner and Nace never intended to permanently retain the limited interests in their partnership.↩
7. Petitioner's 1982 return was due to be filed, pursuant to extensions, on October 15, 1983. Petitioner had received one extension of time to file until August 15, 1983, and a second extension to file until October 15, 1983. Petitioner attempted to obtain a third extension, to November 11, 1983, but the application was denied because he had already been allowed the maximum time of 6 months. The return was finally signed on October 13, 1984, but was not filed with IRS until February 3, 1986, in conjunction with his employment by IRS. Petitioner has conceded the addition to tax for late filing. See supra↩ note 1.
8. In this proceeding, petitioner no longer claims the tax-free-exchange treatment sought in his first amended return.↩
9. He further states that his approach is in Mississippi a very common method of transferring properties into limited partnerships when relatively small amounts of money are involved. Petitioner presented no evidence of this "common practice" except his own vague testimony and the very general statements of Jackson, the lawyer who drafted both the initial draft and the different final version of the Foxfire limited partnership agreement. Whatever the local real estate practice may have been, such practice would not be determinative of the common ownership proscription of section 707(b)(2)(B).↩
10. Petitioner repeats this assertion several times, despite the undisputed fact that some of the limited partnership interests were not sold until March of 1983.↩
11. We note that petitioner claimed 27 percent of Foxfire's 1982 loss based upon his partnership interests as of December 31, 1982, i.e., upon both his general partnership interest (12 percent) and his then remaining limited partnership interest (15 percent).↩
12. In support of this suggestion respondent cites King Enterprises, Inc. v. United States, 189 Ct. Cl. 466, 477, 418 F.2d 511, 516↩ (1969): "aphorisms about 'closely related steps' and 'integrated transactions' may have different meanings in different contexts, and * * * there may be not one rule, but several, depending on the substantive provision of the Code to which they are being applied" (quoting Mintz & Plumb, Step Transactions, pp. 247, 252-253 (1954)).
13. See also Barter v. Commissioner, T.C. Memo. 1990-142↩.
14. There is no indication that Foxfire closed its books when limited partners were taken in in October or again in November of 1982. There is a strong suggestion that that did not↩ occur, since the loss for 1982 was allocated according to the percentages of interest as of December 31, 1982.
15. No such regulations have yet been issued.↩
16. The current version of sec. 707(b)(2)(B) has reduced the percentage to more than 50 percent.↩